STATE EX REL. WALTER R. JOHNSON, ATTORNEY GENERAL, ET AL., APPELLANTS, V. REX HASH ET AL., APPELLEES.

13 N. W. 2d 716

FILED MARCH 24, 1944. No. 31655.

*Andrew D. Mapes, Walter R. Johnson, Attorney General,* and *Rush C. Clarke,* for appellants.

*Frederick M. Deutsch, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, CHAPPELL and WENKE, JJ., and POLK and NUSS, District Judges.

CARTER, J.

This is an appeal from a decree entered by the district court for Madison county in a suit commenced by the state to obtain an injunction to abate a common or public nuisance by reason of the manner of operation of a roadhouse. The trial court granted a part of the relief asked for and denied the balance. The state appeals.

The evidence shows that the defendants operated a tavern or roadhouse just east of the corporate limits of the city of Norfolk. It contained a dance floor, tables, booths and a bar. Dinners and lunches were served, especially in the early evening. The principal sales consisted of "set-ups" used to mix intoxicating liquors for consumption on the premises. Dance music was provided by a juke-box operated by the insertion of coins provided by the customers. The place operates from 8 p. m. to 3 a. m. each day of the week.

The state called 14 officers, including the state sheriff, state patrolmen and inspectors for the Nebraska Liquor Control Commission, who testified to the conditions observed by them prior and up to the date the place was raided on January 23, 1943. Space does not permit a discussion of the testimony of each of these officers. We will content ourselves with a recitation of the facts which we deem established by their testimony. The record discloses that inspections and investigations of the premises were made on numerous occasions by the officers between March 22, 1941, and January 23, 1943.

The testimony of the officers is to the effect that on each inspection the place was patronized by people numbering from 50 to 250. On each occasion Coca-Cola and Seven-Up were served with "set-ups" to mix with whisky and other intoxicating liquors. Whisky bottles were on practically every table and the contents were used in mixing drinks for immediate consumption. Numerous quart, pint and half-pint whisky bottles were observed under the tables and in the booths. The defendants permitted the drinking of these mixed drinks and encouraged it by selling the "set-ups" and

"mix" to those who desired to buy. Intoxicated persons were observed in the tavern by each inspector who investigated the place. Minors of both sexes ranging from 16 to 21 years of age were constantly in the place and participated in the drinking festivities without restraint on the part of the defendants. Minors were observed in an intoxicated condition on almost every inspection. Rough talk, profanity and vulgar language were common, and shouting and unseemly noises appeared to be the rule and not the exception. Slot machines were being operated openly and patrons were usually lined up awaiting their turns to play. Employees stood about to provide the nickels, dimes and quarters needed to play these machines. Other forms of gambling machines were present and given a big play each night the officers observed the place. Quarreling and fighting were continual problems, although the defendant Rex Hash was efficient in quelling such disturbances. The evidence also shows that many automobiles were usually parked near the tavern and that many intoxicated persons drove their cars out on the highway after leaving the place. Several arrests of persons leaving the premises are shown to have been made for speeding, passing up stop signs and driving while intoxicated, which evidences the danger not only to the patrons of the place but to the traveling public generally. Fights were observed on the premises outside the tavern and many persons in various states of intoxication were observed there. We think this evidence is ample to sustain the charge of the state that the place was a resort for people, including minors, to become intoxicated, to become noisy, profane and vulgar and to permit persons of vulgar, dissolute, obscene and roistering habits to congregate and engage in such activities with the approval and encouragement of the defendants.

It is not disputed that slot machines and other gambling devices were maintained by the defendants and that they received a heavy play by patrons, including minors, who frequented the place. The law is that places where gambling is publicly and continuously permitted are public nui-

sances which an equity court should abate by its injunctive processes. *State v. Ak-Sar-Ben Exposition Co.,* 121 Neb. 248, 236 N. W. 736; *State v. The Araho,* 137 Neb. 389, 289 N. W. 545; *Hill v. Pierson,* 45 Neb. 503, 63 N. W. 835.

The evidence does not show that any intoxicating liquors were ever sold by the defendants on the premises in question. It does appear that patrons brought intoxicating liquors with them or had deliveries made after their arrival. The defendants were fully aware of this situation and furthered it by providing the additional essentials to the preparation of mixed drinks. It is urged by defendants that this does not constitute a violation of law and consequently affords no basis for the charge that it constitutes a nuisance.

The evidence is conclusive that defendants openly and continuously permitted minors of both sexes to patronize the place. Defendants, for their own financial gain, furthered the drinking activities of such minors. Defendants well knew, as shown by the record, that the sale of intoxicating liquors to minors was unlawful and that the furtherance of the drinking of intoxicating liquors by minors is contrary to the public welfare. While it may be true that no crime was committed prior to January 23, 1943, in permitting minors to drink intoxicating liquors on the premises, we are of the opinion that a place established for the purpose of attracting persons, including numerous minors of both sexes, desiring to engage in drinking, carousing and roistering, is contrary to the public welfare and deserving of great weight in determining whether a nuisance exists.

It is argued by the defendants that the sale of intoxicating liquors or the operation of a place or house for their sale was not a nuisance at common law. We think this is true if the places or houses were conducted in an orderly manner. It is then argued that as the sale, dispensing and drinking of intoxicating liquors were not nuisances at common law, they cannot now be such unless the acts complained of violate the provisions of some criminal statute. This contention calls for a discussion and interpretation of

the Nebraska Liquor .Control Act (Comp. St. Supp. 1941, ch. 53).

In 1935 the legislature of this state passed the Nebraska Liquor Control Act, the purpose of which is to govern and control the manufacture, sale, giving away, barter, carriage, possession and use of alcoholic liquors in this state. Under the provisions of the act liquor may be sold by the package in cities and villages, unless prohibited by a vote of the people within such cities and villages. Liquor may be sold by the drink in a city or village where the people thereof affirmatively authorize it. Liquor cannot be lawfully sold by the drink outside the corporate limits of cities and villages under any circumstances. In other words, in so far as selling and dispensing liquor by the drink is concerned, the country outside the boundaries of incorporated cities and villages is dry territory. This does not mean that persons may not congregate in such territory for the purpose of imbibing intoxicating liquors. It merely means that business places engaged in selling and dispensing liquors by the drink are not permitted in such areas under the terms of the act. It is quite evident that the legislature had reasons for absolutely prohibiting sales by the drink in rural areas while permitting it in urban areas which affirmatively approved it. Obviously, the legislature thought that there was a relation between group drinking in public places and the health, morals and welfare of the people. It is likewise evident that the legislature was willing to approve sales by the drink in urban areas and to wholly disapprove it in the rural districts. While it is not our province to speculate on the legislative reasons for the classifications made, it is apparent that it felt that the evils of public group drinking could only be controlled when under the surveilance of municipal and other law enforcement officers. Whether the reason be good or not, the restrictions were proper ones for the legislature to make. The act clearly indicates a legislative policy that places which permit sales by the drink and its consequent group drinking in the territory outside the corporate limits of cities and villages are

contrary to the public health, morals and welfare of the people of this state. Such a policy is peculiarly the province of the legislature to declare and for which the courts may not substitute their judgment.

The question then arises whether the purposes of the act may be defeated by having a place of business in a rural district provide the necessary equipment and ingredients for mixed drinks other than the liquor and invite the public to bring its own liquor rather than to purchase it on the premises. It seems to us that all the evils of sales by the drink in rural territory are present and that such a situation is directly violative of the purposes of the act, and the place so operating is a public nuisance.

In connection with the foregoing, it is noteworthy that the legislature provided: "This Act shall be liberally construed, to the end that the health, safety and welfare of the people of the state of Nebraska shall be protected and temperance in the consumption of alcoholic liquors shall be fostered and promoted by sound and careful control and regulation of the manufacture, sale and distribution of alcoholic liquors." Comp. St. Supp. 1941, sec. 53-397. See *State v. Novak*, 7 Wash. 2d 544, 110 Pac. 2d 636.

It is clear that defendants were operating a place of business for profit, which brought upon the community all the evils of public group drinking in rural areas, contrary to the provisions of the Nebraska Liquor Control Act. Defendants cannot escape responsibility for their contribution to the evils decried by the legislature by merely showing that liquor was not sold by them. By the simple expedient of having their patrons bring their own liquor, the defendants furnishing every other facility for the promulgation of the evils proscribed by the legislature, the defendants must be deemed to have created and maintained a public nuisance in direct contravention to the declared purposes of the act.

We think the maintaining of a place where liquor is habitually brought by others to be there consumed, with the encouragement of the owner who profits from the sale of

"set-ups," with all the evil results of public group drinking present, constitutes a public nuisance when such place is operated in territory in which sales by the drink are prohibited and is governed by the rules announced in cases similar in principle which arose during the prohibition era. In *Notary v. United States*, 16 Fed. 2d 434, it was held that a building where intoxicating liquor is habitually brought by others to be there possessed and consumed for beverage purposes was a place where liquor was kept or possessed contrary to law, although no liquor was manufactured, sold, possessed or kept for sale on the premises. The place involved was a roadhouse with a parking place, a pavillion, a kitchen and a dance floor with booths constructed on the sides. A soft drink bar was maintained. Customers brought their own liquor, publicly displayed the bottles on the tables and waiters provided glasses, ice, ginger ale and other soft drinks used in connection with the consumption of the liquor. The court in that case said:

"Now, it will be further noticed that the prohibition of section 21 is specifically directed against the maintaining of the room, house, building, boat, vehicle, structure or place, but its effect is not limited to cases where the one maintaining the place personally does the manufacturing, selling, keeping or bartering. The question then arises, if one maintains a building or place where intoxicating liquor is habitually brought by others to be there possessed and consumed for beverage purposes, and maintains such place and there permits such possession of intoxicating liquor for profit, does he thereby constitute his place a nuisance under the provisions of section 21?

"We have no hesitation in answering this question in the affirmative. We think that, where one maintains a place such as the one here in question, he is engaged in commerce; and if he purposely, and catering to the patronage of the illicit liquor drinking public, permits his patrons to bring intoxicating liquor upon the premises, and there possess it and consume it, and all this to increase the profits of his business, that he is maintaining a place where intoxi-

cating liquor is kept in violation of law. We think the liquor is kept on the place for a commercial purpose when it is permitted to be kept there for a commercial purpose, even though the keeper of the place may not own the liquor. In the given case the keeper's motive and purpose was a commercial one. He kept the place and permitted the unlawful possession of intoxicating liquor therein for profit."

We think the acts of defendants in permitting the equivalent of sales by the drink in territory where sales by the drink are prohibited are, under the holding in the *Notary* case, unlawful and constitute a public nuisance.

We also think the evidence amply sustains a finding that defendants were maintaining a place where persons are permitted to resort for the purpose of drinking alcoholic liquors contrary to the provisions (Comp. St. Supp. 1941, sec. 53-376) of the Liquor Control Act.

Defendants contend that their main business was that of a restaurateur specializing in steaks and fried chicken. It is evident to us, however, that such a business, located outside of the city limits of a city the size of Norfolk, operating only from 8 p. m. to 3 a. m. would have little likelihood of success without other sources of income. Defendants were unable to make any estimate as to the income derived from the sale of food, "set-ups," the juke-box and the gambling machines. We can safely assume, we think, that the sale of food alone would not have made the place a success. It is evident from the record that the main business was the sale of "set-ups" to facilitate spiking with intoxicating liquors and the play obtained on the slot machines and other gambling machines maintained in the place. Drunkenness, quarreling, fighting and gambling, accompanied by profane, obscene and vulgar language, the usual incidents to the maintenance of a "spike joint," were present. Into this place, reeking with the evils which our legislature sought to prevent, came minors of both sexes, ranging from 16 to 21 years of age, to engage in the activities of the place with the apparent approval of these defendants. It is urged that it is not unlawful for people to drink together in rural dis-

tricts and that it is not unlawful to provide "set-ups." Whatever the rule may be in respect to these contentions, in so far as individuals are concerned, it is unlawful to operate a business in territory where liquor cannot be sold by the drink, which has for its primary purpose the selling of "set-ups" and "mix," in order that public group drinking may be afforded to patrons irrespective of the liquor control law and the policy thereof as expressed by the legislature.

Defendants contend that the power of the court is limited to enjoining those things only which the court finds to be unlawful. This might be true if the primary purposes of the establishment are legitimate and the infractions of the law were incidental thereto. But where, as here, the main business of the defendants contravenes the law of the state and the legitimate business of the place is either a sham or a minor part of the whole, the only adequate remedy consists of an abatement of the nuisance by closing the place by injunctive process in the manner prescribed by the legislature.

We conclude therefore that the trial court was in error in failing to enjoin the operation of the roadhouse described in the petition, pursuant to the prayer thereof. The cause is therefore reversed with directions to the trial court to abate the nuisance, pursuant to the provisions of section 53-377, Comp. St. Supp. 1941.

REVERSED, WITH DIRECTIONS.